UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARCI M.,[1]

     Plaintiff,

v.

COMMISSIONER OF SOCIAL
SECURITY,

     Defendant.

Case No. 2:22-cv-12204
District Judge Linda V. Parker
Magistrate Judge Kimberly G. Altman

_____/

**REPORT AND RECOMMENDATION ON
CROSS MOTIONS FOR SUMMARY JUDGMENT**

I.     Introduction

This is a social security case.  Plaintiff Marci M. brings this action under 42

U.S.C. § 405(g), challenging the final decision of Defendant Commissioner of

Social Security (Commissioner) denying her application for Disability Insurance

Benefits (DIB) under the Social Security Act (the Act).  Both parties have filed

summary judgment motions, (ECF Nos. 9, 11), which have been referred to the

undersigned for a Report and Recommendation under 28 U.S.C. § 636(b)(1)(B),

_____

[1] Consistent with guidance regarding privacy concerns in Social Security cases by
the Judicial Conference Committee on Court Administration and Case
Management, this district has adopted a policy to identify plaintiffs by only their
first names and last initials.  *See also* Fed. R. Civ. P. 5.2(c)(2)(B).

1

(ECF No. 2).

For the reasons set forth below, the undersigned RECOMMENDS that Plaintiff's motion, (ECF No. 9), be GRANTED; the Commissioner's motion, (ECF No. 11), be DENIED; and the case be REMANDED FOR BENEFITS. As will be explained, the Appeals Council previously remanded this case for a new hearing and decision. The undersigned believes that another remand would be futile under the circumstances because under a proper analysis of the opinion of Plaintiff's long-time treating psychiatrist Dr. Bernadette Angeles (Dr. Angeles), the record supports a finding of disability based on Plaintiff's extensive and well-documented history of mental impairments.

## II.     Background

### A.     Procedural History

Plaintiff was 40 years old at the time of her alleged onset date of January 24, 2018. (ECF No. 7, PageID.132). She has at least a high school education and past relevant work as a janitor, physical therapy aide, and working in accounts receivable. (*Id.*, PageID.60-61). Plaintiff alleges disability due to bipolar I (mania), personality disorder, need for electroconvulsive therapy, anxiety, depression, suicidal thoughts during depressive swings, bradycardia, arrythmia, trouble sleeping (racing thoughts), and a knee condition (Chondromalacia). (*Id.*, PageID.133).

2

On September 19, 2018, Plaintiff filed an application for DIB.  (*Id.*,

PageID.133).  Her application was initially denied on January 23, 2019.  (*Id.*,

PageID.132-147).  Plaintiff timely requested an administrative hearing, which was

held before the administrative law judge (ALJ) on January 14, 2020.  (*Id.*,

PageID.89-113).  On February 18, 2020, the ALJ issued a written decision finding

that Plaintiff was not disabled, (*id.*, PageID.149-167); this opinion included a

cursory one-paragraph evaluation of an opinion submitted by Dr. Angeles, (*id.*,

PageID.160).  On January 5, 2021, following Plaintiff's request for review, the

Appeals Council entered an order remanding the matter back to the ALJ.  (*Id.*,

PageID.168-172).

> In its remand order, [the] Appeals Council directed the [ALJ] to explain
> whether the findings of [a] prior [administrative] decision remain
> binding,[2] obtain additional evidence concerning [Plaintiff's]
> impairments, further evaluate the severity of the impairments and
> whether they meet or equal a listing, give further consideration to the
> maximum residual functional capacity, and evaluate the opinions.  The
> Appeals Council also directed the [ALJ] to further evaluate the alleged
> symptoms, as well as obtain supplemental evidence from a vocational
> expert.

(ECF No. 7, PageID.46 (internal record citations omitted)).

---

[2] Plaintiff previously applied for DIB on February 24, 2016.  (ECF No. 7,
PageID.46).  An ALJ denied that application on January 23, 2018.  (*Id.*,
PageID.114).  While that ALJ did discuss Plaintiff's mental impairments, the
evidence in the case involved the evaluation of different medical opinions than the
ones at issue now.  (*Id.*, PageID.122-124).  The parties do not challenge the ALJ's
consideration of that prior administrative decision.

On June 9, 2021, the ALJ held a new hearing.  Plaintiff testified at the hearing, as did a vocational expert (VE).  (*Id.*, PageID.69-87).

Plaintiff offered the following testimony.

Since January 2020, Plaintiff continued to suffer from medical impairments that affected her ability to work.  (*Id.*, PageID.72).  She explained that her mental illness caused her to experience a "rollercoaster" of emotions.  (*Id.*, PageID.73).  On some days she felt like she could "run around like crazy[,]" while on others she was depressed and anxiety ridden to the point of being unable to get out of bed.  (*Id.*).  Due to her symptoms, Plaintiff estimated that she would miss around half her shifts each month if she had to work.  (*Id.*, PageID.77).  She was currently taking five medications.  (*Id.*, PageID.79-80).

Plaintiff had been treating with psychiatrist Dr. Angeles for almost ten years.  (*Id.*, PageID.73).  Plaintiff had an appointment with Dr. Angeles approximately every three weeks.  (*Id.*, PageID.73-74).

Plaintiff's mental condition worsened in 2020 after her brother died by suicide.  (*Id.*, PageID.74).  Plaintiff discovered her brother's body.  (*Id.*).

The VE offered the following testimony.

In a medium, unskilled jobs such as a janitor or stock worker, an individual would be permitted "two scheduled 15-minute breaks and 30 minutes for lunch."  (*Id.*, PageID.85-86).  Further, "[i]f an individual was going to have consistent,

4

unscheduled absences, they could miss one to two days per month, but no more than 15 in a year." (*Id.*, PageID.86). All competitive work would be precluded for an individual who would be off task for over 10% of the day. (*Id.*).

On July 29, 2021, the ALJ issued a written decision finding that Plaintiff was not disabled. (*Id.*, PageID.43-67). As will be explained in more detail below, the ALJ did not find the opinion of Dr. Angeles persuasive to support a finding of disability based on Plaintiff's mental impairments. On August 1, 2022, the Appeals Council denied Plaintiff's request for review, (*id.*, PageID.30-34), making the ALJ's decision the final decision of the Commissioner. Plaintiff timely filed for judicial review of the final decision. (ECF No. 1).

B.    Medical Evidence

Many of the medical records either predate Plaintiff's alleged onset date of January 24, 2018, or postdate her date last insured of December 31, 2020. These records are omitted from the following summation of the medical evidence because they fall outside of the relevant period. *See, e.g.*, *Lowery v. Comm'r of Soc. Sec.*, 886 F. Supp. 2d 700, 716 n.8 (S.D. Ohio 2012) ("In determining whether a Plaintiff is 'disabled,' the ALJ generally only considers evidence from the alleged disability onset date through the date last insured."). Further, on appeal, Plaintiff only challenges the ALJ's assessment of her mental health issues. Accordingly, records related solely to Plaintiff's physical health will not be summarized.

5

Records dated between February 20, 2018, and December 11, 2020, from Plaintiff's treating psychiatrist Dr. Angeles show that Plaintiff was diagnosed with bipolar disorder and regularly treated with Dr. Angeles to manage her symptoms.

At her February 20, 2018 appointment, Plaintiff reported feeling "tired, 'out of it' and 'flat' and somewhat dissociated and wonder[ed] if it [was a] side effect to medication." (*Id.*, PageID.494). She was in the process of "recovering from a long cold." (*Id.*). Plaintiff further reported "[m]ild depression and apathy[,]" but "[d]enie[d] anger, impulsivity or racing thoughts." (*Id.*). She noted experiencing "[s]ome residual paranoid ideation," which she believed was chronic in nature and doubted would " 'ever go away.' " (*Id.*). Dr. Angeles recommended that Plaintiff participate in psychotherapy, but Plaintiff was unable to do so because she had "some paranoid ideation that prevent[ed] her from establishing rapport." (*Id.*, PageID.498). Plaintiff was compliant with her medication, which included Seroquel, Wellbutrin, Tegretol, Restoril, and Prozac. (*Id.*, PageID.494-495).

Approximately a month later, on March 19, 2018, Plaintiff returned to Dr. Angeles. (*Id.*, PageID.499). Plaintiff reported increased anger and trouble sleeping since she began taking Wellbutrin. (*Id.*, PageID.499). She "had a couple of anger outburst with friends and family." (*Id.*). Plaintiff estimated that she was "only getting 2-3 hours per night [of sleep] despite [taking] [S]eroquel." (*Id.*). She reported stopping Wellbutrin and resuming Prozac two days prior. (*Id.*).

6

Plaintiff's medications remained the same other than the discontinuation of Wellbutrin and a temporary increase in Seroquel to help her sleep.  (*Id.*, PageID.499-500).

At her May 1, 2018 appointment with Dr. Angeles, Plaintiff reported "depressed mood, low energy/motivation, anhedonic and more isolative."  (*Id.*, PageID.504).  She also reported "[s]leeping almost too much."  (*Id.*).  Dr. Angeles slightly increased Plaintiff's Prozac dose to better treat her depression but directed Plaintiff to monitor for mania and to contact her in the event of a manic episode.  (*Id.*, PageID.507).

On July 16, 2018, Plaintiff had an appointment with Dr. Angeles where she reported feeling " 'manic-y' " and eating THC brownies to help decrease her mania.  (*Id.*, PageID.509).  She further reported difficulty sleeping at night due to racing thoughts.  (*Id.*).  Plaintiff was feeling "physically not well," but was unable to further describe how she felt.  (*Id.*).  She was also dealing with stress related to "getting [her] brother into rehab."  (*Id.*).  Plaintiff had stopped taking extra doses of Seroquel due to weight gain.  (*Id.*).  Dr. Angeles noted that Plaintiff was "mildly fidgety" during the appointment and adjusted her medications to better manage Plaintiff's current symptoms of mania and insomnia.  (*Id.*, PageID.512).

At her appointment on August 6, 2018, Plaintiff told Dr. Angeles that she had been ruminating excessively about her brother's relationship with his girlfriend

who had been cheating on him.  (*Id.*, PageID.514).  Plaintiff was "frustrated that [her] brother [was] taking her back and won't go to rehab."  (*Id.*).  Plaintiff denied impulsivity and depression.  (*Id.*).  She was sleeping around five to six hours every night.  (*Id.*).  Dr. Angeles referred Plaintiff to an anger management program.  (*Id.*, PageID.517).

A few weeks later, on August 24, 2018, Plaintiff's partner accompanied her to her appointment with Dr. Angeles.  (*Id.*, PageID.519).  They reported that Plaintiff was doing better and that her moods were more stable.  (*Id.*).  Plaintiff was experiencing a "[si]gnificant decrease in anger/irritability and [was] not ruminating as much despite continued stressors with her brother."  (*Id.*).  She reported that she had been sleeping seven hours every night.  (*Id.*).

Notwithstanding improvements in other areas, Plaintiff had begun "getting engrossed in books."  (*Id.*).  She was reading for hours every day and found it "hard to snap back into reality."  (*Id.*).  Plaintiff's partner was "noticing intermittent grandiose thoughts where [Plaintiff] feels she commands a better understanding or interpretation of a book that other people cannot grasp."  (*Id.*).

At her September 21, 2018 appointment with Dr. Angeles, Plaintiff reported that she had recently sprained her ankle, which had left her "physically confined to the couch, causing [her] high anxiety, antsiness."  (*Id.*, PageID.524).  Plaintiff also reported feeling manic; however, she was not social and could not handle crowds.

8

(*Id.*).  Plaintiff's sleep was "somewhat disturbed," but she was able to get at least five hours of sleep every night.  (*Id.*).  Dr. Angeles adjusted the dosages of Plaintiff's current medications and started Plaintiff on a retrial of Neurontin for anxiety and mood stabilization.  (*Id.*, PageID.535).

On October 30, 2018, Plaintiff returned to Dr. Angeles and asked to decrease her mood stabilizer because she was feeling depressed as well as "too mellow and somewhat apathetic."  (*Id.*, PageID.537).  Plaintiff reported that she was stressed because she was looking for her sister who had gone missing.  (*Id.*).  Plaintiff said that her sleep was adequate.  (*Id.*).  Dr. Angeles decreased Tegretol "due to possible oversedation and fogginess" and noted that she might increase Prozac if "apathy/depression persist[ed]."  (*Id.*, PageID.547).

At her December 10, 2018 appointment, Plaintiff told Dr. Angeles that "her moods have been relatively stable [with] no pronounced ups or downs."  (*Id.*, PageID.740).  Plaintiff reported "[s]ome low level of apathy and decreased energy."  (*Id.*).  She was "[f]rustrated with weight gain since [taking] [S]eroquel xr and [was] unable to get weight off despite exercise."  (*Id.*).  Given Plaintiff's concerns about Seroquel, Dr. Angeles decided to slowly switch her to Latuda.  (*Id.*, PageID.749, 752).  Dr. Angeles also prescribed Valium to help Plaintiff manage air travel to and from Florida.  (*Id.*, PageID.752).

On March 6, 2019, Plaintiff returned to Dr. Angeles and reported "doing

9

very well" since starting Latuda and decreasing Seroquel.  (*Id.*, PageID.754).  She was "[f]eeling 'normal emotions' and not feeling numb."  (*Id.*).  Plaintiff did report "[p]ossible mild manic [symptoms] where her mood is somewhat elevated and only sleeping 5 hours per night."  (*Id.*).  However, she denied impulsivity, irritability, and anger, and expressed that she "wants to be around people."  (*Id.*). While Plaintiff was still experiencing "some dissociation" it was "not causing [her] distress."  (*Id.*).

Given Plaintiff's improvements on Latuda, Dr. Angeles directed her to continue to taper off Seroquel and continue Latuda.  (*Id.*, PageID.766).  Dr. Angeles noted that she would consider increasing Plaintiff's dosage of Latuda if her "moods destabilize[d]" with the discontinuation of Seroquel.  (*Id.*).  Dr. Angeles also referred Plaintiff to someone to talk to about her past sexual trauma. (*Id.*).

A few weeks later, on March 25, 2019, Plaintiff called Dr. Angeles' office to report scratching and vomiting since discontinuing Seroquel.  (*Id.*, PageID.777). Plaintiff began taking Seroquel again and these issues stopped.  (*Id.*).  Upon receiving the message, Dr. Angeles instructed her office to tell Plaintiff to continue taking a low dosage of Seroquel.  (*Id.*).

At her May 6, 2019 appointment, Plaintiff reported worsening symptoms since decreasing Seroquel.  (*Id.*, PageID.778).  Plaintiff was struggling with anger,

impulsivity, and sleeping at night. (*Id.*). Plaintiff's underlying anger was causing her hands to shake and leading to public outbursts. (*Id.*). She also almost impulsively purchased a $2,000 dog. (*Id.*). Plaintiff was also still unable to lose weight despite diet and exercise. (*Id.*).

Given Plaintiff's worsening symptoms, Dr. Angeles increased her dosage of Seroquel and continued her current dosage of Latuda. (*Id.*, PageID.789). She noted that Plaintiff had done best on a combination of "[S]eroquel xr 50 mg low dose and [L]atuda low dose 40 mg." (*Id.*). Dr. Angeles also recommended that Plaintiff find a therapist to help her with anger management. (*Id.*).

On June 25, 2019, Plaintiff had an appointment with Dr. Angeles where she reported feeling overwhelmed trying to manage stressors and other people's demands related to a baby shower and wedding that she was planning to attend. (*Id.*, PageID.791). She reported that her "[m]oods have been overall stable and report[ed] only brief [ ] episodes of depression and anger" that she had been "able to redirect." (*Id.*).

At her August 21, 2019 appointment with Dr. Angeles, Plaintiff reported feeling tired, unmotivated, and physically fatigued with some shortness of breath. (*Id.*, PageID.804). Despite these symptoms, Plaintiff denied feeling depressed. (*Id.*). She had been sleeping well and getting eight hours of sleep at night. (*Id.*). Dr. Angeles recommended that Plaintiff see her primary care physician (PCP) and

11

ordered bloodwork.  (*Id.*, PageID.816).  She also directed Plaintiff to taper off Latuda as Plaintiff felt this medication might be making her tired.  (*Id.*).

On September 24, 2019, Plaintiff and/or her partner called Dr. Angeles' office.  (*Id.*, PageID.827).  It was reported that Plaintiff had been undergoing medical testing after experiencing gastrointestinal and cardiac symptoms for a couple of weeks.  (*Id.*).  This was causing Plaintiff to have "some huge anxiety issues."  (*Id.*).  Plaintiff's partner requested a Xanax prescription for Plaintiff.  (*Id.*).

A few days later, on September 27, 2019, Plaintiff presented for an appointment with Dr. Angeles.  (*Id.*, PageID.828).  Plaintiff explained that her recent cardiac workup had been negative, but that she was planning to undergo a stress test and gastrointestinal workup.  (*Id.*).  Plaintiff was upset with her PCP because he was suspecting that Plaintiff's symptoms "may be psychiatric in nature."  (*Id.*).  Plaintiff asked if she could retry a higher dosage of Seroquel as she believed it was helpful for her mood and anxiety.  (*Id.*).  Dr. Angeles increased Plaintiff's Seroquel as requested and discontinued Latuda for ineffectiveness.  (*Id.*, PageID.840).

On October 22, 2019, Plaintiff had an appointment with Dr. Angeles where she reported a decrease in her physical symptoms since increasing her dosage of Seroquel.  (*Id.*, PageID.841).  While she reported that her anxiety and mood had

stabilized, she explained that she was still experiencing "residual anxiety where she has catastrophic thoughts [and] difficulty shutting [her] mind off." (*Id.*). Plaintiff was sleeping well. (*Id.*). Dr. Angeles increased Seroquel to address Plaintiff's residual anxiety. (*Id.*, PageID.853).

At her December 17, 2019 appointment with Dr. Angeles, Plaintiff reported that she had stopped taking Prozac because she was "feeling too activated" and she was afraid to continue taking it. (*Id.*, PageID.1000). She also reported experiencing residual anxiety, tenseness, and some panic as well as sleeping poorly with a "concurrent depressed mood." (*Id.*). Plaintiff was feeling triggered by a family member who had been staying in her home for three months. (*Id.*). However, she did feel like her anxiety and physical symptoms had improved since restarting Seroquel. (*Id.*). Dr. Angeles discontinued Prozac and increased Plaintiff's dosage of Seroquel. (*Id.*, PageID.1011).

On February 5, 2020, Plaintiff returned to Dr. Angeles and reported that she had not "been sleeping for the past month." (*Id.*, PageID.988). Plaintiff's partner had been holding on to her credit card as Plaintiff had been struggling with "some impulses to shop." (*Id.*). Plaintiff was also experiencing "[s]ome minor mood swings." (*Id.*). Plaintiff did not want to increase her dosage of Seroquel because she was worried about gaining weight if it was increased. (*Id.*). Dr. Angeles increased Plaintiff's dosage of Restoril to better treat her insomnia. (*Id.*,

PageID.999).

At her March 31, 2020 telemedicine appointment, Plaintiff reported to Dr. Angeles that "she is doing surprisingly well despite [the] current pandemic." (*Id.*, PageID.897). Plaintiff explained that she "[f]eels her mood improves during crises but may crash when crisis [is] over." (*Id.*). Plaintiff experienced "continued sleep disturbance despite increase in [R]estoril to 30 mg." (*Id.*). She was getting five to six hours of sleep each night. (*Id.*). Dr. Angeles recommended that Plaintiff begin taking Restoril closer to bedtime to help her sleep better. (*Id.*, PageID.908).

On May 4, 2020, Plaintiff had a crisis telemedicine appointment with Dr. Angeles. (*Id.*, PageID.975). Three days prior, Plaintiff discovered her brother's body following his death by suicide. (*Id.*). Plaintiff was experiencing flashbacks and felt " 'numb' with high anxiety." (*Id.*). She was unable to sleep at night and was not eating due to nausea. (*Id.*). Plaintiff's partner had taken the week off work to stay with her, and Plaintiff was afraid of being alone once she went back to work. (*Id.*). Dr. Angeles planned to refer Plaintiff to Beaumont for partial hospitalization if it was currently accepting patients for such treatment. (*Id.*, PageID.987). Dr. Angeles also increased Plaintiff's dosage of Seroquel and continued her short-term prescription for Xanax. (*Id.*).

A couple of weeks later, on May 18, 2020, Plaintiff returned to Dr. Angeles where she reported that she had not yet been able to pick up her increased

14

prescription for Xanax.  (*Id.*, PageID.1155).  Plaintiff felt that she was trying to avoid her emotions and reported that she was still experiencing "flashbacks of [her] brother[']s death at night and not sleeping well."  (*Id.*).  Plaintiff was continuing to feel anxious and had begun to feel the warning signs for a depressive episode.  (*Id.*).  At Dr. Angeles' recommendation, Plaintiff agreed to contact a therapist.  (*Id.*, PageID.1167).

At her June 16, 2020 telemedicine appointment, Plaintiff reported experiencing manic symptoms for a few days, including hypersexuality.  (*Id.*, PageID.1142).  She was struggling with "[i]mpulsive thoughts which are very out of character for her and worries that this will become a pure blown mania."  (*Id.*).  Plaintiff also felt guilty that she was feeling manic when "she should be grieving her brother's death."  (*Id.*).  Dr. Angeles determined that the benefits of increasing Plaintiff's dosage of Seroquel outweighed the risks of her gaining weight, and thus increased the dosage.  (*Id.*, PageID.1154).

On July 7, 2020, Plaintiff had a telemedicine appointment with Dr. Angeles where she reported that she was "experiencing human emotions for the first time since her brother's death."  (*Id.*, PageID.1129).  She was currently struggling to deal with her feelings of sadness and hopelessness but was still hesitant to seek therapy.  (*Id.*).  Plaintiff expressed interest in seeing her brother's former therapist, which Dr. Angeles cautioned against.  (*Id.*, PageID.1129, 1141).  Since increasing

Seroquel, Plaintiff's symptoms of mania had resolved.  (*Id.*, PageID.1129).  Dr. Angeles increased Plaintiff's dosage of Seroquel again.  (*Id.*).

At her July 28, 2020 telemedicine appointment, Plaintiff reported "almost feeling flat and too tired and oversedated with increase in dose [of Seroquel]."  (*Id.*, PageID.1116).  As such, Dr. Angeles decreased her dosage of Seroquel.  (*Id.*, PageID.1128).

A month later, on August 28, 2020, Plaintiff reported to Dr. Angeles during a telemedicine appointment that she had fully transitioned from mania to a moderate depressive episode.  (*Id.*, PageID.1102).  She was experiencing transient suicidal ideation, but she had no plan or intent.  (*Id.*).  Plaintiff expressed both interest and some fear in hospitalization for treatment and also reported that she kept taking the higher dosage of Seroquel because she felt that it was helping her sleep.  (*Id.*).  Dr. Angeles prescribed a trial of Lamictal and kept Plaintiff on the higher dosage of Seroquel.  (*Id.*, PageID.1114).

At her September 2, 2020 telemedicine appointment, Plaintiff reported some improvement since starting Lamictal, including a "minor decrease in depression" and feeling less hopeless.  (*Id.*, PageID.1078).  However, she was still experiencing significant depression and decreased appetite.  (*Id.*).

Plaintiff had two additional telemedicine appointments with Dr. Angeles during September 2020—one on September 10 and the other on September 28.  On

September 10, Plaintiff informed Dr. Angles that she would be unable to participate in the partial hospitalization program at Beaumont because it cost $6,000.  (*Id.*, PageID.1054).  Plaintiff reported that her depression had improved since her last appointment.  (*Id.*).  She was also feeling "optimistic since her [niece] is pregnant and delivering in May and some small part of her thinks it is her brother reborn."  (*Id.*).  Plaintiff also reported continued "severe sleep disturbance" for which Dr. Angeles increased her dosage of Gabapentin.  (*Id.*, PageID.1054, 1077).  On September 28, Plaintiff reported a significant decrease in depression since starting Lamictal, however, she was struggling to sleep at night.  (*Id.*, PageID.1012).  Dr. Angeles decreased Plaintiff's dosage of Lamictal in case it was affecting her sleep and noted that Plaintiff was "very sensitive to antidepressants and cycling."  (*Id.*, PageID.1052).

At her October 27, 2020 telemedicine appointment, Plaintiff reported being stressed because her sister was staying with her and Plaintiff was helping to care for her nephew.  (*Id.*, PageID.963).  Plaintiff also reported feeling more irritable and agitated.  (*Id.*).  Plaintiff was unable to focus during the appointment and showed Dr. Angeles "all areas of her home."  (*Id.*).  Plaintiff had also begun impulse spending and experiencing interrupted sleep.  (*Id.*).  Plaintiff's partner asked her to start taking Xanax, but Plaintiff refused to do so.  (*Id.*).

On December 11, 2020, Plaintiff had her final telemedicine appointment

with Dr. Angeles for the relevant period.  (*Id.*, PageID.949).  Plaintiff reported that she was no longer feeling manic or angry and/or irritable, instead she was "starting to feel 'empty.'"  (*Id.*).  Plaintiff was sleeping more, and her partner had noticed her change in mood.  (*Id.*).  Dr. Angeles restarted Plaintiff on Lamictal due to the return of her depression.  (*Id.*, PageID.962).

III.    Framework for Disability Determinations (the Five Steps)

Under the Act, DIB is available only for those who have a "disability."  *See Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007).  The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Commissioner's regulations provide that a disability is to be determined through the application of a five-step sequential analysis:

Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

18

Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that the claimant can perform, in view of his or her age, education, and work experience, benefits are denied.

*Carpenter v. Comm'r of Soc. Sec.*, No. 08-10279, 2008 WL 4793424, at *4 (E.D. Mich. Oct. 31, 2008) (citing 20 C.F.R. § 404.1520); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001).  "The burden of proof is on the claimant throughout the first four steps. . . .  If the analysis reaches the fifth step without a finding that claimant is not disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of Health & Hum. Servs.*, 14 F.3d 1107, 1110 (6th Cir. 1994).

Following this five-step sequential analysis, the ALJ found that Plaintiff was not disabled under the Act.  At Step One, the ALJ found that Plaintiff had not engaged in substantial gainful activity between January 24, 2018 (alleged onset date) and December 31, 2020 (date last insured).  (ECF No. 7, PageID.49).  At Step Two, the ALJ found that she had the severe impairments of anxiety, bipolar

disorder, affective disorder, post-traumatic stress disorder (PTSD), a heart arrhythmia, and obesity.  (*Id.*).  At Step Three, the ALJ found that none of Plaintiff's impairments met or medically equaled a listed impairment.  (*Id.*, PageID.50).

The ALJ then assessed Plaintiff's residual functional capacity, concluding that she was capable of performing medium work and noted that she:

- [Could] [f]requently balance, kneel, crouch, and climbing of [sic] stairs;
- [Could] [o]ccasionally crawl;
- [Could] [n]ever climb ladders, ropes, or scaffolds;
- Must avoid concentrated exposure to extreme cold, heat, wetness, humidity, noise, vibration, fumes, odors, dusts, gases, and poor ventilation;
- Must avoid even moderate exposure to hazards at the worksite (unprotected heights and moving machinery);
- [Could] [p]erform simple tasks in environments that [are] free from the stresses of fast-paced production rate or tandem tasks;
- [Could] [p]erform tasks which require nothing more than superficial interactions with others; and
- Would work best in a stable job with few, if any, changes in work requirements.

(*Id.*, PageID.52 (bolding omitted)).

At Step Four, the ALJ found that Plaintiff was capable of performing past relevant work as a janitor as generally performed in the national economy.  (*Id.*, PageID.60).  As a result, the ALJ concluded that Plaintiff was not disabled under the Act.  (*Id.*, PageID.62).

IV.    Standard of Review

A district court has jurisdiction to review the Commissioner's final administrative decision under 42 U.S.C. § 405(g).  Although a court can examine portions of the record that were not evaluated by the ALJ, *Walker v. Sec. of Health & Hum. Servs.*, 884 F.2d 241, 245 (6th Cir. 1989), its role is a limited one.  Judicial review is constrained to deciding whether the ALJ applied the proper legal standards in making his or her decision, and whether the record contains substantial evidence supporting that decision.  *Tucker v. Comm'r of Soc. Sec.*, 775 F. App'x 220, 224-225 (6th Cir. 2019); *see also Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007) (noting that courts should not retry the case, resolve conflicts of evidence, or make credibility determinations); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 783 (6th Cir. 2017) (same), *aff'd sub nom. Biestek v. Berryhill*, 139 S. Ct. 1148 (2019).

An ALJ's factual findings must be supported by "substantial evidence."  42 U.S.C. § 405(g).  The Supreme Court has explained:

> Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains sufficient evidence to support the agency's factual determinations.  And whatever the meaning of substantial in other contexts, the threshold for such evidentiary sufficiency is not high.  Substantial evidence, this Court has said, is more than a mere scintilla.  It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.

*Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (cleaned up).

21

In making "substantial evidence" the relevant standard, the law preserves the judiciary's ability to review decisions by administrative agencies, but it does not grant courts the right to review the evidence de novo. *Moruzzi v. Comm'r of Soc. Sec.*, 759 F. App'x 396, 402 (6th Cir. 2018) (" 'The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts.' " (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009))). An ALJ's factual findings are therefore subject to multi-tiered review, but those findings are conclusive unless the record lacks sufficient evidence to support them. *Biestek*, 139 S. Ct. at 1154.

Although the substantial evidence standard is deferential, it is not trivial. The court must " 'take into account whatever in the record fairly detracts from [the] weight' " of the Commissioner's decision. *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)). Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakley*, 581 F.3d at 406 (internal quotation marks and citation omitted). Finally, even if the ALJ's decision meets the substantial evidence standard, "a decision of the Commissioner will not be upheld where the [Social Security Administration (SSA)] fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the

claimant of a substantial right." *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647,

651 (6th Cir. 2009) (internal quotation marks and citations omitted).

V.     Analysis

A.     Parties' Arguments

Plaintiff argues that "the ALJ failed to properly articulate the supportability

and consistency factors when he evaluated the opinion authored by long-time

treating psychiatrist, Dr. Angeles." (ECF No. 9-1, PageID.1220 (internal record

citation omitted)).  In response, the Commissioner argues that "[t]he ALJ correctly

found that [Dr. Angeles'] opinions were not persuasive because they were not

supported by Dr. Angeles' generally normal mental status evaluations and they

were inconsistent with Plaintiff's ability to engage in a range of social and daily

activities." (ECF No. 11, PageID.1234).

B.     Legal Standard

When evaluating a medical opinion, the ALJ must articulate "how

persuasive [he] find[s] all of the medical opinions and all of the prior

administrative medical findings in [the claimant's] case record." 20 C.F.R. §

404.1520c(b).  The ALJ evaluates the persuasiveness of the medical opinions and

prior administrative medical findings by utilizing the following five factors: (1)

supportability; (2) consistency; (3) relationship with the claimant; (4)

specialization; and (5) other factors.  § 404.1520c(c).  Supportability and

23

consistency are the most important factors and the ALJ must explain how he considered these factors in his decision.  § 404.1520c(b)(2).

### C.     Medical Opinion of Dr. Angeles

At issue is the ALJ's evaluation of Dr. Angeles' medical source statements (mental).  Dr. Angeles completed the form statements on November 6, 2018, (ECF No. 7, PageID.554-557), and November 14, 2019, (*Id.*, PageID.735-738).

### 1.     2018 Opinion

Dr. Angeles indicated that she had been treating Plaintiff since April 2012, for bipolar disorder type I.  (*Id.*, PageID.554).  Even though Plaintiff had been compliant with treatment, her response to "several trials of medication" had been limited.  (*Id.*).  Plaintiff struggled with "significant mood swings, difficulty coping to stressors[, and] clinic dissociative [symptoms]."  (*Id.*).  Plaintiff experienced side effects from her prescribed psychotropic medications including oversedation, mental fogginess, and fatigue.  (*Id.*).  Dr. Angeles noted that at some appointments, Plaintiff "demonstrated racing thoughts, flight of ideas and pressured speech, [and] concentration impairment during manic episodes."  (*Id.*).  She rated Plaintiff's prognosis as fair-guarded.  (*Id.*).

Dr. Angeles explained that Plaintiff experienced periods of mania and depression.  (*Id.*, PageID.557).  During periods of mania, Plaintiff exhibited "socially inappropriate behaviors [and] impulsivity."  *(Id.)*.  While during periods

24

of depression, Plaintiff socially isolated herself and exhibited an inability to leave her home. (*Id.*).  Dr. Angeles further explained that Plaintiff experiences "rapid cycling of moods [and] can have several mood episodes within a year.  [She also h]as frequent periods of dissociation, [where she is] not in reality that impair[] [her] functioning." (*Id.*).

Dr. Angeles estimated that Plaintiff's symptoms would affect her attention and concentration for 25% or more of a typical workday and would cause her to miss more than four days of work each month.  (*Id.*, PageID.555, 557).  She believed that Plaintiff would be limited in a workplace because she "exhibits severe mood swings [and] manic episodes causing severe concentration disturbance, racing thoughts [and] impairment in judgment [and] insight." (*Id.*, PageID.556).  Dr. Angeles further stated that Plaintiff was "unable to cope to even minor stressors without decompensating" and that her "concentration impairment precludes processing complex tasks." (*Id.*).  Finally, Dr. Angeles noted that Plaintiff's partner managed her finances and limited Plaintiff's credit card usage. (*Id.*, PageID.557).

## 2.    2019 Opinion

Dr. Angeles indicated that she had been treating Plaintiff since April 2013, for bipolar disorder type I (primary diagnosis) and posttraumatic stress disorder (secondary diagnosis).  (*Id.*, PageID.735).  She noted that Plaintiff has had a

"limited response" to pharmacotherapy as she was still suffering from "residual symptoms." (*Id.*).  Plaintiff took numerous psychotropic medications and suffered from side effects including sleepiness, orthostatic hypertension, and dizziness. (*Id.*).

Dr. Angeles had last seen Plaintiff on September 27, 2019, and October 22, 2019.  (*Id.*).  At the September appointment, Plaintiff appeared unkempt and thinner with a tense affect and anxious mood.  (*Id.*).  At the October appointment, Plaintiff seemed "[m]uch improved."  (*Id.*).  Overall, Dr. Angeles rated Plaintiff's prognosis as fair.  (*Id.*).  Dr. Angeles estimated that Plaintiff's symptoms would affect her attention and concentration for 25% or more of a typical workday and would cause her to miss more than four days of work each month.  (*Id.*, PageID.736, 738).

### 3.    ALJ's Evaluation of Dr. Angeles' Opinion

In his decision, the ALJ evaluated Dr. Angeles' opinion as follows:

Dr. Angeles also completed a medical source statement in November 2018.  She stated that despite compliance with treatment, [Plaintiff] had only limited response to medication and had significant mood swings, difficulty coping with stress, and clinical dissociative symptoms.  Dr. Angeles indicated that [Plaintiff] had no useful ability to function and was unable to meet competitive standards in the majority of the mental abilities and aptitudes necessary for unskilled work, semi-skilled, and skilled work.  Particularly, she reported severe concentration issues and impaired judgment and insight.  She stated that [Plaintiff] would likely be off task 25% or more of the workday, and be absent more than four days per month.  In November 2019, Dr. Angeles's opinion seemed to indicate improvement in [her] ability to do unskilled work, as the

26

majority of aptitudes and abilities were no longer "no useful ability to function" but now were just "unable to meet competitive standards." Nevertheless, Dr. Angeles indicated that [Plaintiff] was unable to meet competitive standards for the majority of abilities necessary for unskilled, semiskilled, and skilled work.  She continued to endorse that [Plaintiff] would be off task 25% or more of the workday and be absent more than four days per month.

However, Dr. Angeles's opinions are inconsistent with her generally normal mental status examinations, which normally do not indicate any significant difficulty with memory, attention, judgment, and insight, even during periods of mania or depression.  This level of disability is also inconsistent with her ability to travel on vacations, such as hiking in Ohio and going to Florida, her ability to participate in social activities (like baby showers and weddings), and her ability to perform activities of daily living.  Further, there is no substantial and consistent evidence that [Plaintiff] would be unable to meet competitive standards for simple work, or that she would be off task 25% of the workday, or absent four days per month.  Therefore, Dr. Angeles's opinions are unpersuasive.

(ECF No. 7, PageID.59-60 (internal record citations omitted)).

### D.    Application

The ALJ's evaluation of Dr. Angeles' opinion reflects a misunderstanding of

mental illness generally and bipolar disorder specifically.  As the Sixth Circuit

explained over 30 years ago,

a psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine.  In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness.  When mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals

27

trained in the field of psychopathology.  The report of a psychiatrist
should not be rejected simply because of the relative imprecision of the
psychiatric methodology or the absence of substantial documentation,
unless there are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (cleaned up).  In

practice, this means that "the rule allowing an ALJ to reject opinions based on self-

reports does not apply in the same manner to opinions regarding mental illness."

*Buck v. Berryhill*, 869 F.3d 1040, 1049 (9th Cir. 2017).

Under current regulations, the ALJ was required to evaluate Dr. Angeles'

opinion using the following factors: (1) supportability; (2) consistency; (3)

relationship with the claimant; (4) specialization; and (5) other factors.  §

404.1520c(c).  While the ALJ is only required to explain how he considered the

factors of supportability and consistency, *see* § 404.1520c(b)(2), the factors of

relationship with the claimant and specialization should not be ignored in a case

such as this one where they are particularly relevant.  By including the existence of

a relationship with the claimant in the factors, "[t]he regulations provide

progressively more rigorous tests for weighing opinions as the ties between the

source of the opinion and the individual become weaker."[3]  *Gayheart v. Comm'r of*

*Soc. Sec.*, 710 F.3d 365, 375-76 (6th Cir. 2013) (editing in original) (quoting SSR

---

[3] While this case dealt with older regulations that are not at issue in this case, the
Sixth Circuit's reasoning is still applicable under the current regulations with
regard to the consideration of a medical provider's relationship with a claimant.

28

No. 96–6p, 1996 WL 374180, at *2 (Soc. Sec. Admin. July 2, 1996)).

It does not appear that the ALJ considered Dr. Angeles' relationship with Plaintiff nor her specialization—either explicitly or implicitly—when finding her opinion unpersuasive. Nor does he mention one of the mandatory factors— supportability. The Commissioner suggests that the ALJ did consider supportability when he explained that he found Dr. Angeles' opinion inconsistent with the medical records. However, consistency is a distinct factor under the regulations, and the Commissioner's argument "incorrectly de-emphasize[s] the significance the regulations place on the 'supportability' factor by conflating it with the 'consistency' factor." *Elaine S. v. Comm'r of Soc. Sec. Admin.*, No. 3:22-cv-240, 2023 WL 6290070, at *2 (S.D. Ohio Sept. 27, 2023).

> On the one hand, supportability emphasizes a medical source's explanations: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) . . ., the more persuasive the medical opinions will be." 20 C.F.R. § 416.920c(c)(1). On the other hand, consistency emphasizes the need to compare medical source opinions with other evidence of record: "The more consistent a medical opinion(s) . . . is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) . . . will be." 20 C.F.R. § 416.920c(c)(2).

*Id.* Regardless, no matter how the ALJ termed his evaluation of Dr. Angeles' opinion, that evaluation is flawed.

The ALJ asserted that "Dr. Angeles's opinions are inconsistent with her generally normal mental status examinations." (ECF No. 7, PageID.59). This

assertion is contrary to Dr. Angeles' records for the relevant period, which show that Plaintiff struggled with mood regulation to the point that Dr. Angeles changed some aspect of her medication regimen more often than not.  Further, the records reflect that Plaintiff was often struggling with either depression or mania at appointments and that she almost always struggled with sleeping an adequate amount at night even though she was always taking medications specifically prescribed to aid with sleep.  Despite this evidence, the ALJ found that Plaintiff's psychiatric records were "generally normal."  In so finding, the ALJ either failed to account for or mischaracterized evidence regarding the frequency of Plaintiff's appointments, the number of adjustments made to her prescribed psychotropic medications, and the consistent struggles that Plaintiff faced, including with mood regulation, anger management, coping with stressors, and sleep.  Thus, his finding is not supported by the evidence, much less substantial evidence.

Moreover, the ALJ overstated Plaintiff's ability to participate in social activities and travel in discrediting Dr. Angeles' opinion.  He asserted that the level of disability opined by Dr. Angeles was "inconsistent with [Plaintiff's] ability to travel on vacations, such as hiking in Ohio and going to Florida, her ability to participate in social activities (like baby showers and weddings), and her ability to perform activities of daily living."  (*Id.*, PageID.60 (internal record citations omitted)).  Dr. Angeles' records suggest that Plaintiff traveled only twice in a

30

three-year period—once to Ohio (a state neighboring Michigan) and once to
Florida (a trip that required the prescription of Valium)—and attended a baby
shower and wedding over the course of one summer (events that caused Plaintiff
stress).  (*Id.*, PageID.524, 752, 791).

Additionally, Plaintiff's ability to engage in some hobbies during upswings
in her mood does not reflect an ability to maintain fulltime employment.
Particularly, because the record shows that Plaintiff struggled to engage in some of
her hobbies in a healthy way.  For instance, during a period where she was
frequently reading books, Plaintiff's partner informed Dr. Angeles that she was
"noticing intermittent grandiose thoughts where [Plaintiff] feels she commands a
better understanding or interpretation of a book that other people cannot grasp."
(*Id.*, PageID.519).  Plaintiff also admitted to having a hard time coming back to
reality when she was reading a lot.  (*Id.*).  Ultimately, the ALJ erred by overstating
Plaintiff's ability to travel, participate in social activities, and perform activities of
daily living as part of his evaluation of Dr. Angeles' opinion.  *See Lyle v. Comm'r
of Soc. Sec. Admin.*, No. 3:17-cv-00368, 2019 WL 2026734, at *7 (S.D. Ohio May
8, 2019), *report and recommendation adopted*, 2019 WL 2330421 (S.D. Ohio May
31, 2019) ("It was error for the ALJ to misconstrue Plaintiff's statements about
caring for his children while ignoring other information he provided in the same
form that tended to confirm he was markedly impaired in social functioning."); *see*

31

*also Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) ("[A] substantiality of evidence evaluation does not permit a selective reading of the record."); *Minor v. Comm'r of Soc. Sec.*, 513 F. App'x 417, 435 (6th Cir. 2013) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (stating that "[an] ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position").

The ALJ's characterization of Plaintiff's mental health treatment as conservative also misses the mark. Plaintiff regularly treated with Dr. Angeles, and according to Dr. Angeles' records, was almost always compliant with her medications. Further, "penalizing an individual suffering from mental impairments like bipolar disorder for failing to seek treatment or take medication is a questionable practice." *Sarp v. Comm'r of Soc. Sec.*, No. 16-cv-10099, 2017 WL 1365414, at *8 (E.D. Mich. Apr. 14, 2017) (internal quotation marks and citation omitted); *see also Kellett v. Colvin*, No. 13-CV-12884, 2015 WL 181650, at *15 (E.D. Mich. Jan. 14, 2015) ("[P]laintiffs suffering from mental impairments, particularly bipolar disorder, should not be penalized for failure to seek psychiatric treatment."), *report and recommendation adopted*, 2015 WL 181650 (E.D. Mich. Jan 14, 2015).

Here, Dr. Angeles noted in one record that while she recommended Plaintiff

participate in psychotherapy, Plaintiff was unable to do so because she had "some

paranoid ideation that prevent[ed] her from establishing rapport." (*Id.*,

PageID.498). This statement suggests that it was Plaintiff's bipolar disorder itself

that was making it difficult for her to obtain all recommended treatment. Further,

at Dr. Angeles' recommendation, Plaintiff looked into obtaining more intensive

treatment via partial hospitalization at Beaumont; however, the $6,000 cost for

treatment was prohibitive. (*Id.*, PageID.1054). Social Security Ruling 18-3p[4]

provides that inability to afford treatment is a justifiable cause for failing to follow

prescribed treatment, meaning the ALJ erred to the extent he found that Plaintiff

obtained only conservative treatment without considering whether she could afford

more aggressive treatment such as hospitalization. *See also McKnight v. Sullivan*,

927 F.2d 241, 242 (6th Cir. 1990) (agreeing with the conclusion that a "condition

that is disabling in fact continues to be disabling in law," when the claimant

"cannot afford prescribed treatment or medicine and can find no way to obtain it."

(internal quotations marks and citations omitted)).

In sum, the ALJ's evaluation of Dr. Angeles' medical opinion was riddled

with errors and undermines his finding that Plaintiff is not disabled. Dr. Angeles'

---

[4] Social Security Ruling 18-3p states that one "example[] of [an] acceptable good cause reason[] for not following prescribed treatment" is if "[t]he individual is unable to afford prescribed treatment, which he or she is willing to follow, but for which affordable or free community resources are unavailable."

opinion is consistent with the record evidence and supported by her treating records. Further, she is specialized is psychiatry and has been Plaintiff's treating psychiatrist for almost a decade. As such, her opinion should have been regarded as highly persuasive under the § 404.1520c(c) factors by the ALJ. And crediting Dr. Angeles' opinion that she would expect Plaintiff to miss more than four days of work each month and be off task for 25% or more of the day, (*id.*, PageID.555, 557, 736, 738), results in a conclusion that Plaintiff is unable to engage in substantial gainful activity due to her mental impairments. This is consistent with the VE's testimony that at most Plaintiff could have two unscheduled absences each month and could not be off task for more than 10% of the day. (*Id.*, PageID.85-86).

Finally, to the extent it is argued that the ALJ erred in evaluating the opinion of the state agency psychological consultant Kathy A. Morrow, Ph.D. (Dr. Morrow), the undersigned agrees. Dr. Morrow opined that Plaintiff had the ability to work, but the only medical record she references is from Plaintiff's October 20, 2018 appointment with Dr. Angeles, (*id.*, PageID.143-144), and she did not personally evaluate Plaintiff. The ALJ evaluated Dr. Morrow's opinion as follows:

> Dr. Morrow's opinion is persuasive because it is consistent with the medical evidence presented prior and subsequent to that determination. The records indicate that the claimant only sought treatment for her psychological impairments on a very limited basis, sometimes not even once per month. Only after experiencing a loss that caused her significant grief in 2020 did the claimant begin therapy. Prior to that time, she was only prescribed medication and she exhibited relatively normal mental status examinations (as discussed above).

(*Id.*, PageID.59).

As explained above, the ALJ mischaracterized the nature and extent of Plaintiff's treatment by stating that she sought treatment "on a very limited basis" and was "only prescribed medication." Other than pointing out Plaintiff's decision not to attend talk therapy, the ALJ never expressed what kind of psychiatric treatment he would have more highly regarded than taking psychotropic medications and regularly attending appointments with a psychiatrist. Further, as Plaintiff notes, Dr. Morrow's opinion appears to be based on a very limited portion of Plaintiff's medical records, which goes to the supportability of her opinion. *See Miller v. Kijakazi*, No. 2:20-CV-013-DCP, 2021 WL 3494563, at *11 (E.D. Tenn. Aug. 9, 2021) ("[T]he ALJ failed to subject the opinions of the nonexamining state agency consultants to sufficient scrutiny when her analysis did not cover the entire record or reflect that the nonexamining state agency consultants did not consider the presence of any functional limitations related to Plaintiff's vision impairments."); *see also Gayheart*, 710 F.3d at 379 ("[T]he ALJ's explanation for giving Dr. Onady's opinions little weight reflects the rigorous scrutiny he applied

35

to those opinions.  His failure to apply the same level of scrutiny to the opinions of

the consultative doctors on which he relied . . . calls into question the ALJ's

analysis.").  Overall, the ALJ's finding that Dr. Morrow's opinion was highly

persuasive is not supported by substantial evidence.

E.      Remedy

Under Sentence Four of 42 U.S.C. § 405(g), the reviewing court may enter

"a judgment affirming, modifying, or reversing the decision of the Commissioner

of Social Security, with or without remanding the cause for a rehearing."  The

Sixth Circuit has held that it is appropriate to remand for an award of benefits,

without rehearing, when "all essential factual issues have been resolved and the

record adequately establishes a plaintiff's entitlement to benefits."  *Kim v. Comm'r

of Soc. Sec.*, No. 12-11694, 2013 WL 3981893, at *8 (E.D. Mich. Aug. 1, 2013)

(citing *Faucher v. Sec'y of Health & Hum. Servs.*, 17 F.3d 171, 176 (6th Cir.

1994)).  "This comports with the principle that 'where remand would be an idle

and useless formality, courts are not required to convert judicial review of agency

action into a ping-pong game.' "  *Palaghe v. Comm'r of Soc. Sec.*, No. 15-11920,

2016 WL 1714733, at *18 (E.D. Mich. Apr. 28, 2016) (quoting *Wilson v. Comm'r

of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004) (citations omitted)).

Here, there are dozens of records from Dr. Angeles supporting her opinion

that Plaintiff is unable to work.  Her opinion is both supported by and consistent

with the medical records. Dr. Angeles had also treated Plaintiff for nearly a decade at the time of the hearing and psychiatry is her medical specialty. Thus, all of the listed § 404.1520c(c) factors are easily met. Contrary to his analysis, the ALJ's decision does not highlight any inconsistencies in the record with Dr. Angeles' opinion, and he failed to assess its supportability. Upon the undersigned's independent review of the record, there is no choice but to find Dr. Angeles' opinion highly persuasive. If the ALJ had given the proper weight to Dr. Angeles' opinion, he would have found Plaintiff to be disabled.

Furthermore, the ALJ's decision now being appealed is his second attempt at resolving this matter. The Appeals Council found his first opinion deficient, and remanded in part so he could reevaluate the record medical opinions. *See* ECF No. 7, PageID.46. The ALJ should not be given a third opportunity to properly evaluate Dr. Angeles' opinion. As one district court put it in a similar case:

> The undersigned also notes the unusual circumstances of this case: three unsound ALJ decisions, all of which included reversable error in the analysis of the same treating physician. Given these circumstances and the strong, uncontroverted evidence of record in support of a finding of disability, there is no just reason to further delay this matter for even more administrative procedures. *See Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 730 (6th Cir. 2014) (remanding for benefits after two remands and three administrative hearings); *see also Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication"); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) ("Because of the medical record, we think it unconscionable to remand this eight-year-old case to the Secretary for further review").

*Masters v. Comm'r of Soc. Sec.*, 382 F. Supp. 3d 726, 734 (S.D. Ohio Apr. 9, 2019).  Here, as in *Masters* and the cases cited therein, the unusual circumstances of this case render it unjust to remand for further administrative proceedings.

Ultimately, Plaintiff has demonstrated that she is entitled to benefits through the submission of her extensive psychiatric records for the relevant period as well as the highly persuasive opinion of her long-time treating psychiatrist.  There is no need to remand for further administrative proceedings in a case such as this one where the plaintiff has established her entitlement to benefits and there are no unresolved factual issues.  Accordingly, this case should be remanded for benefits under Sentence Four of 42 U.S.C. § 405(g).

## VI.    Conclusion

For the reasons stated above, the undersigned RECOMMENDS that Plaintiff's motion, (ECF No. 9), be GRANTED; the Commissioner's motion, (ECF No. 11), be DENIED; and the case be REMANDED FOR BENEFITS.

Dated: January 29, 2024                   s/Kimberly G. Altman
Detroit, Michigan                         KIMBERLY G. ALTMAN
                                          United States Magistrate Judge


## **NOTICE TO PARTIES REGARDING OBJECTIONS**

The parties to this action may object to and seek review of this Report and Recommendation.  Any objections must be filed within 14 days of service, as

provided for in Federal Rule of Civil Procedure 72(b)(2) and Local Rule 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 144 (1985); *Howard v. Sec'y of Health & Hum. Servs.*, 932 F.2d 505, 508 (6th Cir. 1991). Filing objections that raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health & Hum. Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers, Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Under Local Rule 72.1(d)(2), any objections must be served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

## <u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 29, 2024.

s/Carolyn Ciesla

CAROLYN CIESLA

Case Manager
